**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

```
_____
                              :
JOSEPH P. GANIM,              :
                              :      Civil Action No.
             Petitioner,      :      06-2957 (RBK)
                              :
        v.                    :      O P I N I O N
                              :
THE FEDERAL BUREAU OF PRISONS,:
                              :
        et al.,               :
                              :
        Respondents.          :
_____:
```

**APPEARANCES:**

> JOSEPH P. GANIM, pro se
> #14466-014
> FCI Fort Dix
> P.O. Box 1000
> Fort Dix, NJ  08640

**ROBERT B. KUGLER, District Judge**


Petitioner JOSEPH P. GANIM (hereinafter "Petitioner") currently confined at the Federal Correctional Institution (hereinafter "F.C.I."), Fort Dix, New Jersey, filed an application for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and submitted due filing fee. The application consists of Petitioner's petition (hereinafter "Petition") and numerous exhibits, with the

entire package totaling sixty six pages.  Having thoroughly reviewed Petitioner's application, the Court denies Petitioner's request for a Writ of Habeas Corpus.

## BACKGROUND

Petitioner, who was sentenced to a term of imprisonment of hundred and eight months,[1] has been and is confined at the F.C.I. Fort Dix.  See Pet., Mem. at 1.  On August 10, 2005, Petitioner "requested to be transferred to a suitable FCI camp, which was closer to his home."  Id.  Petitioner based his request on the language of the Program Statement 5100.07 (hereinafter "P.S. 5100.07").  See id. at 2.  Petitioner's request was denied by the prison's Unit Manager, and the denial was based on the very same language of P.S. 5100.07.  See id.  Petitioner now contests the reading of P.S. 5100.07 suggested by the BOP.  See id. 4-5.  Petitioner also asserts that the BOP failed to assess Petitioner's application in accordance with the factors suggested by the United States Court of Appeals for the Third Circuit in Woodall v. Fed. Bureau of Prisons, 432 F.3d 235 (3d Cir. 2005).  See id. at 6.  In

---

[1]

Petitioner, the former mayor of the City of Bridgeport, was convicted of sixteen counts of racketeering, bribery, extortion, mail fraud and tax fraud.  See United States v. Ganim, 3:01cr263 (JBA).  According to Petitioner's PACER records, Petitioner was ordered to pay restitution in the amount of $147,617 and a fine in the amount of $150,000.  See https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl/501042282952437-L_923_0-1.

support of his application, Petitioner attaches letters from Petitioner's spouse and various other relatives asserting that traveling to the F.C.I. Fort Dix burdens their lifestyles and budget.[2]   See id., Exs. D-E.   Petitioner, therefore, requests transfer to Otisville, New York.   See Pet., Mem. at 2.

## STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.   Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.   See Royce v.

---

[2]

The "To Whom It May Concern" letter of Mrs. Ganim, Petitioner's spouse (hereinafter "Spouse's Letter"), specifies that Petitioner's older sons, one of whom is "an avid gymnast" and the another who "plays soccer, baseball and basketball," experience time conflicts between their sport practices and visits to Petitioner, since the latter are time consuming because of the need to commute to Fort Dix.   See Pet., Ex. D.   In addition, the Spouse's Letter states that Petitioner's youngest son "misses his Dad terribly and it would benefit him a great deal if [Petitioner] were closer and he could see him more."   Id.   Finally, the Spouse's Letter observes that, since "the price of gas has gone up considerably," the gasoline cost of visitations burdens the spouse's budget.   Id.   Petitioner's letter to the Fort Dix officials similarly states that Petitioner's parents, who are in their late 60's and 70's, "struggle as often as they can to visit." Id.   Finally, a letter from Petitioner's mother states that many other Petitioner's relatives are similarly inconvenienced by the need to commute to Fort Dix because Petitioner "has four brothers and three sisters [and] there are many nieces and nephews," coordinated trips of which present a challenge in planning.   Id., Ex. E.

Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## DISCUSSION

### A.   Scope of Judicial Review of an Agency Decision

Petitioner is seeking a writ of habeas corpus and review of an agency action.   As they relate to habeas relief, this Court has jurisdiction to consider Petitioner's claims under 28 U.S.C. § 2241, the only statute that confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence.   A habeas petition filed in the district where the petitioner is confined provides a remedy to challenge the effect of events subsequent to imposition of his sentence.   See Gomori v. Arnold, 533 F.2d 871, 874-75 (3d Cir. 1976).

Examining such challenge, the Court is required to "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law."   5 U.S.C. § 706(2)(A).   However, "the Court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).   Therefore, this Court must: (1) determine whether the denial of Petitioner's request for re-designation was a permissible construction and/or application of the regime set forth in the Program Statements at issue; and (2)

uphold the agency ruling if such construction was permissible.  Cf.

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467

U.S. 837 (1984) (outlining the two-step analysis to determine the

validity of an agency regulation and of application(s) of such

regulation).


**B.    Failure to Meet the Exhaustion Requirement**

Petitioner's Petition states that Petitioner's request for

transfer was denied by Petitioner's Unit Manager.  See Pet., Mem.

at 3.    The Petition is silent as to whether Petitioner ever

appealed the denial to the BOP.

> A federal prisoner ordinarily must exhaust his
> administrative remedies before petitioning for a writ of
> habeas corpus pursuant to § 2241. [See] Moscato v.
> Federal Bureau of Prisons, 98 F.3d 757, 760 (3d Cir.
> 1996); see also Callwood v. Enos, 230 F.3d 627, 634 (3d
> Cir. 2000) ("we have consistently applied an exhaustion
> requirement to claims brought under § 2241").    If a
> petitioner has failed to exhaust his administrative
> remedies prior to filing a § 2241 petition, the District
> Court may in its discretion either "excuse the faulty
> exhaustion and reach the merits, or require the
> petitioner to exhaust his administrative remedies before
> proceeding in court." Brown v. Rison, 895 F.2d 533, 535
> (9th Cir. 1990), abrogated in part on other grounds by
> Reno v. Koray, 515 U.S. 50 (1995); see also Greene v.
> Meese, 875 F.2d 639, 643 (7th Cir. 1989) (explaining that
> exhaustion of administrative remedies is not a
> jurisdictional prerequisite).

Ridley v. Smith, 2006 U.S. App. LEXIS 11127, at *2-3 (3d Cir. Pa.

May 3, 2006).    Since there is no indication in Petitioner's

Petition that Petitioner's claims were duly exhausted

administratively, this Court shall dismiss the Petition for failure

to meet the exhaustion requirement.   See id.


C.   **Due Process Rights**

Even if this Court is to presume that Petitioner duly exhausted his claims and merely omitted stating so in his exhaustive sixty-six page submission, Petitioner's claims lack merit.

It is well established that no petitioner has a Due Process liberty interest in being assigned to the correctional institution of his choice.   See Wilkinson v. Austin, 125 S. Ct. 2384, 2393 (2005) (noting that the Constitution does not give rise to a liberty interest in avoiding transfers to more adverse conditions of confinement); Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Montayne v. Haymes, 427 U.S. 236, 243 (1976); Walker v. Hughes, 558 F.2d 1247, 1252 (6th Cir. 1977)("Federal statutory law gives federal prison officials full discretion in the treatment of prisoners and does not restrict the authority of prison officials over the inmates as to placement in more restrictive living status, transfer to other prisons, subjection to significant and adverse effects on parole dates, and deprivation of privileges").   Moreover, the matters of placement of prisoners are among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Meachum,

427 U.S. 225.  In fact, the Supreme Court has held:

> The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. . . . Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the . . . prison system.  Confinement in any . . . institution[] is within the normal limits or range of custody which the conviction has authorized . . . to impose.

Id. at 224-25 (1976).

Liberty interests, however, may also be created by *mandatory* language contained in statutes and regulations, see, e.g., Sandin v. Conner, 515 U.S. 472, 483-84 (1995), Torres v. Fauver, 292 F.3d 141, 151 (3d Cir. 2002).


**D.    Petitioner's Challenge Under the Mandate of P.S. 5100.07**

The regulatory regime set forth in P.S. 5100.07 unambiguously discourages routine transfers, leaving *discretionary* transfers within the spectrum of OP's authority.  The regulation provides, in pertinent parts, as follows:

> Routine Transfers.
> Redesignation of an inmate should generally result in a move closer to an inmate's release destination . . . . In order to attempt to place an inmate near his or her release residence, redesignations should be made without regard to regional boundaries.  ORDINARILY, THE INMATE MAY BE CONSIDERED FOR A NEARER RELEASE TRANSFER AFTER SERVING 18 MONTHS WITHIN THE FACILITY . . . . Redesignations between same security level institutions are discouraged, except for CIM purposes, closer to home purposes, or other unusual circumstances.  A "nearer to release" transfer should be incorporated with "lesser

Page -7-

security" transfers whenever possible.  Once the inmate
has been transferred within 500 miles of his or her
release residence, no further referrals should be made as
a "nearer to release" transfer consideration.

P.S. 5100.07

Petitioner asserts that the BOP "mistakenly conflate[d] . . .
two separate and distinct phases, which are clearly intended to
apply to different things, as indicated by the . . . us[age] of
quotation marks on the phrase 'nearer to release.'" Pet. at 2.
According to Petitioner, the usage of quotation marks indicates
that discouragement of transfers within 500 mile rule applies to,
and only to, "nearer to release" transfers but not to "closer to
home transfers" and, since the latter ones "should not be
'discouraged,'" Petitioner should have be transferred to Otisville,
the camp of Petitioner's choice located closer to Petitioner's
family residence.  Id. at 2-5.

Petitioner errs.  The structure of the regulatory paragraph
quoted above clearly indicates that "redesignations between same
security level institutions are discouraged." P.S. 5100.07.  The
qualifying language "except for . . .  closer to home purposes"
merely provides that "routine transfers" shall be made only to
place an inmate "near his or her release residence" after the
inmate serves his or her initial eighteen months of confinement
term.  The term "near" is further defined as an area within 500
miles of the inmate's release residence.  Id.   In other words,

Page  -8-

once an inmate approaches his or her release time, the inmate should be routinely transferred closer to the inmate's release residence, which is presumed to be the inmate's home.  Id.  It follows that the inmate who, after the initial eighteen months of his or her prison term, is already confined within 500 miles of his or her home, does not qualify for any routine transfer since the inmate is already placed "near his or her release residence."  Id.

Petitioner's desire to divorce the concept of "near his or her release residence" from that of "closer to home" is bewildering since it implies a scheme under which an inmate, upon his or her release, is expected to reside--or be forced to reside--*away* from the inmate's pre-incarceration home, removed from the inmate's relatives and social ties.  However, nothing in the language of P.S. 5100.07, or in the actual practices of the BOP, indicates such scheme.  The sole reasonable reading of P.S. 5100.07 leads to the conclusion that the concept of "near his or her release residence" and that of "closer to home" are effectively indistinguishable for the purposes of a routine "near release" transfer.

Moreover, Petitioner's desire to equate the concept of "closer to home" with that of "closer to the home of the inmate's relatives" is equally unavailing.  Nothing in the Program Statement guarantees visits by relatives,[3] or the ease of executing such

---

[3]
In fact, there is no constitutional right to visitation.  See Overton v. Bazzetta, 539 U.S. 126 (2003) ("The very object of

visits, nor does it suggest any obligations on the part of the BOP to house inmates in a fashion minimizing the transportation hardships of those who might desire to visit these inmates.   If this Court is to take Petitioner's contention to its logical conclusion, then the BOP would be obligated to transfer every inmate to the prison nearest to the residence of each of such inmate's relatives and then keep transferring the inmate if a relative chooses to move.   Clearly, such shuffling scheme is unrealistic and cannot be read by this Court into the language of P.S. 5100.07 which aims at nothing more and nothing less than to promote a basic social reintegration of inmates that are about to be released into the society.

Therefore, this Court finds that BOP's refusal to transfer Petitioner was indeed reasonable in light of the language of P.S. 5100.07.   While this Court indeed recognizes that commute-related inconveniences might burden Petitioner's relatives by (1) causing alteration of sports training sessions, (2) necessitating commute-related fees, or (3) imposing certain hardships related to age or to planning of visits by large groups of travelers, these inconveniences do not change the result of the applicable legal

imprisonment is confinement.  Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper incarceration. [F]reedom of association is among the rights least compatible with incarceration.   Some curtailment of that freedom must be expected in the prison context.")

analysis under  P.S. 5100.07.  It is an unfortunate fact that *any* inmate serving a lengthy sentence of imprisonment may eventually find his or her relatives burdened by the need to commute for visitation.[4]  Indeed, the loved ones of *all* inmates will inevitably age, they *all* may have children who, in turn, would grow up and develop their own needs and interests, and the commute-related costs are likely to keep rising over time for *all* inmates' relatives, same as for the society at large.

### E.   Petitioner's Challenge Under Woodall

Petitioner also challenges the refusal to transfer Petitioner to Otisville under the decision entered by the Court of Appeals for the Third Circuit in Woodall v. Fed. Bureau of Prisons, 432 F.3d 235.[5]

---

[4]

In that regard, the Court notes that the penal theory encompasses various elements, including the retribution element which serves as a deterrence to commit a crime since this element envisions that a convict could be imprisoned and, thus, separated from his relatives or loved ones. See W. R. Lafave & A. W. Scott, Criminal Law § 1.5(a) (2d ed. 1986).

[5]

Petitioner also challenges the decision under Barden v. Keohane, 921 F.2d 476 (3d Cir. 1991), by citing an excerpt of the Barden opinion.  It appears that Petitioner reads Barden as a case somehow related to Petitioner's circumstances.  Petitioner errs. In Barden, the petitioner

was arrested by Pennsylvania authorities and charged with robbery, rape and kidnaping.  While awaiting trial on the state charges, [the petitioner] was given over to the custody of federal authorities . . . under a writ of habeas corpus ad prosequendum.  He was sentenced to a

The <u>Woodall</u> Court held that 18 U.S.C. § 3621(b)'s legislative history specifically required the BOP to consider, for the purposes of placing or transferring an inmate, a number of § 3621(b) factors.[6]   Petitioner appears to suggest that the BOP did not

> prison term of twenty years on a bank robbery conviction by the United States District Court for the Western District of Pennsylvania and then returned to state custody.  The [State] Court . . . sentenced [the petitioner] to a term of eleven-to-thirty years on the state charges . . . , and ordered that the state sentence run concurrently with the federal sentence. [The petitioner] then began to serve his state sentence in [a s]tate [c]orrectional [i]nstitution . . . where a federal detainer was lodged against him.  . . . [The petitioner] was [eventually] paroled from state custody . . . and turned over to federal authorities under the detainer. He entered [a federal] penitentiary . . . and [after he started] serving his twenty-year federal sentence for bank robbery, [he]  attempt[ed] to gain credit for the time he served in state prison by having the [s]tate [c]orrectional [i]nstitution . . . designated a federal facility <u>nunc</u> <u>pro</u> <u>tunc</u> [through an] administrative relief from the [BOP]. When these efforts failed, he sought judicial relief in the district court.

<u>Id.</u> at 478.

Reviewing the district court's decision, the Third Circuit read the issue through the prism of various provisions, including Section 3621(b), determining that (1) the federal sentence could not possibly refer to the then-unexisting state sentence, but (2) the post-state-sentence considerations of the federal bench had to be sought and considered by the BOP.  Since the situation and the holding of <u>Barden</u> are completely different from the circumstances of Petitioner, the Court has no reason to address Petitioner's <u>Barden</u> claim.

[6]

These factors include availability or suitability of the facility selected, the resources of the facility considered, the nature and circumstances of the offense, the history and characteristics of the prisoner, the statements made by the sentencing court concerning the purposes for imprisonment in a particular case, any recommendations as to type of facility made by

consider the Woodall factors because (1) Petitioner earned various certificates during his prison term, as well as acknowledgments of Petitioner's good conduct and assistance with various prison projects, yet (2) was not transferred as Petitioner desired. See Pet., Mem. at 1, Exs. H-L.

This Court disagrees. While the Court finds it commendable that Petitioner "has developed an outstanding record in all assignments at the camp," Pet., Mem. at 1, Petitioner's status as a "model inmate" does not qualify him for a transfer of his choice since the history and characteristics of the prisoner are just one consideration listed by 18 U.S.C. § 3621(b).

Conversely, Petitioner's placement and retention at Fort Dix appears to be well in line with 18 U.S.C. § 3621(b).[7]  In fact, Petitioner's application was expressly considered in light of P.S. 5100.07.  See Pet., Ex. A.  Moreover, another key considerations, namely, the statements made by the sentencing court and the court's recommendations as to the facility where Petitioner was to be placed was fully satisfied, since the sentencing court's

_____

the court, and any pertinent policy statements issued by the sentencing commission pursuant to 28 U.S.C. § 994(a)(2).  See Woodall, 432 F.3d at 246-47.

    [7]  The denial of Petitioner's request for transfer (hereinafter "Response") indicates that the Unit Manager also considered the current and future suitability of the facility selected, since the Response expressly reflects on Petitioner's undergoing work with Petitioner's counselor and the facility's future plans. See Pet., Ex. A.

recommendation reads expressly as follows:

> The Court recommends that [Petitioner] be designated to a [F.C.I.] with the following order of priority: Otisville, Devens, Fort Dix, Allenwood, and either Pensacola or Eglin.

Pet., Ex. C.

Hence, it is undisputed that, being placed right at the outset of his prison term in the F.C.I. Fort Dix, Petitioner had the "recommendations as to type of facility made by the court" satisfied.  The mere fact that Petitioner was given the third rather than the first choice in the list of six cannot be read as an indication that the BOP was heedless to the opinion of Petitioner's sentencing bench.

In sum, this Court finds that retention of Petitioner at Fort Dix does not indicate that the BOP failed to consider <u>Woodall</u> factors when Petitioner's request for transfer was denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner's Petition is denied. An appropriate order accompanies this opinion.


**ROBERT B. KUGLER**
**United States District Judge**

Date: July 31, 2006